IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| GENESIS HEALTH CLUBS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-1269-JWL |
| | ) | |
| LED SOLAR & LIGHT COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## **MEMORANDUM AND ORDER**

This case was tried to the Court on December 16 and 17, 2014, and by agreement, the parties made their closing arguments by written briefs submitted post-trial. This Memorandum and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

Based on the evidence presented at trial and the parties' arguments, and as more fully set forth below, the Court concludes that neither party met its burden of proof with respect to its affirmative claims. Accordingly, judgment is entered in favor of defendant on plaintiff's claims, and judgment is entered in favor of plaintiff on defendant's counterclaims.

## I.  <u>Findings of Fact</u>

Plaintiff Genesis Health Clubs, Inc. operates various health clubs, including a club on Rock Road in Wichita, Kansas ("the facility").  Ryan Brooks served as plaintiff's chief financial officer at all times relevant to this suit.

Defendant LED Solar & Light Company, which has its headquarters in Virginia, manufactures and sells LED lamps.  Defendant's principal at all relevant times was Paul Arnone.

In 2011, Bruce Redinger, who was acquainted with one of plaintiff's principals, proposed to plaintiff that it investigate replacing its lights at the facility with energy-efficient LED lights.  Eventually, Mr. Redinger introduced plaintiff to defendant.  Mr. Redinger entered into an agreement with defendant by which Mr. Redinger would receive 20 percent of the sale price if defendant sold plaintiff LED lights.  Defendant sent samples of various lights (with fixtures) for plaintiff to view, and those lights, which were uniformly white in color, worked properly.  Defendant made a written proposal to plaintiff to sell lights for three of plaintiff's clubs, but plaintiff eventually agreed to purchase lights only for the one facility.

At some point during negotiations of the sale, Mr. Brooks asked Mr. Redinger for a guarantee from defendant concerning the energy savings that would result from the replacement of plaintiff's lights at the facility.  On July 29, 2011, Mr. Redinger wrote an e-mail to Mr. Brooks, in which he stated: "I will guarantee a 35% drop in your electricity bill proportioned to the light pull on that bill."  Mr. Redinger testified that any

information that he passed along to plaintiff concerning energy savings came from defendant.

Defendant submitted a proposed written contract to plaintiff, dated August 11, 2011, for the sale of LED lights for the facility. The contract was drafted by defendant, with the exception that Mr. Redinger inserted plaintiff's name and address and a list of the existing and new bulbs. On August 23, 2011, Mr. Brooks sent Mr. Redinger an e-mail indicating that he wished to pursue the purchase from defendant, but that he had a couple of questions first. With respect to the energy savings guarantee offered by defendant, Mr. Brooks wrote as follows:

> There is still some concerns, as to the guarantee. Please give me a written response as to what will happen if we do not achieve the 35% reduction/savings in our utility bill. Now again when I did our calculation here I used one of our smallest $ energy bills to calculate the savings. Our March 2011 Westar Energy bill was in the amount of $5,894. A 35% savings would be $2,062. Please address this scenario and the "what if" it doesn't measure up.

Mr. Redinger responded to Mr. Brooks by e-mail the same day. In response to the question quoted above, Mr. Redinger wrote as follows:

> As depicted in the contract there is a watt deduction statement of a minimum of 35%. **"Based on the type of lighting replacement this project calls for the LED Solar and Light Company warranties watt for watt exchange a minimum of 35% deduction in wattage consumption".** If you look at the watt comparison it is well beyond of 35%. If the existing bulbs were at full wattage life, which I am sure they are not, the wattage difference with implementation of the LED's lamps compared to the existing fluorescent is substantial! I took the watt savings and multiplied it bulb for bulb allowing also for the ballast by-pass and computed a 49,110watt decline with our LED lamps installed–as shown on the breakdown on the contract. If you multiply that by your current

3

> watt rate at $0.08, this is $3,928.80.  This seems to be a very safe number for you to engage replacement.  Remember, I cannot guarantee this number due to rate changes and not every bulb is at full capacity wattage now.  Frankly, the wattage reduction is depicted and certified by the ratings on each and every lamp.  Documented Energy Star, and by government standards.  This as we discussed was calculated on your light replacement only!  I cannot guarantee a 35% reduction in your total utility bill in its entirety.  I do not know how much your HVAC portion runs, but I do know that by replacing the existing over 400 degree bulbs in your environment by maximum of 175 degree heat disbursement of the LED it will diminish and impact your usage dramatically.

(Emphasis in original.)  Based on this response from Mr. Redinger, Mr. Brooks decided to execute the written contract proposed by defendant, which he signed on August 24, 2011.

The contract purchase price for the lights was $82,271.50.  At the request of defendant, plaintiff paid 80 percent of that amount to defendant and 20 percent of the purchase price directly to Mr. Redinger, to satisfy his share under his agreement with defendant.  To pay for the lights and also for installation of the lights, an affiliate company secured a loan in the amount of $90,000.00, which resulted in a monthly loan payment of $1,685.34 per month.  Mr. Brooks testified that Mr. Redinger, in oral statements, presented the deal with defendant as one that would result in monetary energy savings in an amount sufficient to cost of the lights (i.e., the amount of the monthly payment on the loan).

For the reasons set forth below, the Court finds that Mr. Redinger did not make any express warranty to plaintiff on behalf of defendant, either in an e-mail or orally, concerning any energy savings that plaintiff would realize from the purchase of lights

4

from defendant, other than the express written warranty contained in the parties contract.

The parties' contract listed the bulbs to be purchased, with a comparison by wattage to the bulbs to be replaced at the facility, as follows:

|  | Existing Wattage | LED Wattage |
|---|---|---|
| F48 T8 Fluorescent | 32W | 18W |
| Fluorescent Ballast | 15W | 0W |
| F96 T8 Fluorescent | 96W | 40W |
| F24 T8 Fluorescent | 46W | 20W |
| Metal Halide | 400W | 30W |
| Metal Halide Ballast | 55W | 0W |
| MPS | 400W | 90W |
| MPS Ballast | 60W | 0W |
| MR16 | 50W | 3W |
| Par38 | 65W | 12W |

Underneath the list of purchased lights (with quantities purchased, unit prices, and total prices), the total contract price, and the parties signatures, the contract included a paragraph that began as follows:

> This proposal is valid for 30 days from the date above.  Any other verbal or written proposals or agreements preceding this proposal are void. Based on the type of lighting replacement this project calls for LED Solar and Light Company warranties watt for watt exchange a minimum of 35% deduction in wattage consumption.

In addition, as conceded by Mr. Arnone in his testimony, plaintiff purchased bulbs that were a particular shade of white.  The Court finds that defendant did make an express warranty that the bulbs would be uniformly white.  The purchased lights generally consisted of lights known as tubes, pizza "trays" or "pans", and "cobs".

Prior to shipment, the purchased lights were tested and operated properly over a

24-hour period at defendant's facility.  Plaintiff retained electrician Roger Chaffin and his company to install the lights.  According to Mr. Brooks's testimony, the lights worked properly when first installed at plaintiff's facility.

Within the first weeks after installation, plaintiff began to experience problems with the operation of the new lights, particularly the pizza trays and cobs.  Various witnesses testified that lights would come on only partially or not at all, or would delay in coming on, or would flicker.  Mr. Arnone then visited plaintiff's facility in order to attempt to ascertain the source of and remedy the problems with the lights.  Mr. Arnone did fix some damaged lights and met with various employees of plaintiff and Mr. Chaffin.  Mr. Arnone testified to a number of problems at the facility that could have caused problems with the operation of the lights, including the following:  when certain lights were installed, the electricians did not use cables to tie certain heavy lights in place, which failure could have caused damage and caused the lights to lose contact with the sockets; electricians caused damage by forcing some lights in place from above instead of properly installing them from below; existing wall switches had been improperly installed, which caused lights not to come back on after being off for a period of time; other circuits were turned off; a completed circuit could not be made in various fixtures; existing sockets (which in some cases were not the original sockets for the facility) were defective; electricians did not avoid banging the lights against surfaces, which lack of care could have damaged the lights' electronic parts (Mr. Arnone did observe damaged parts); and lights were not stored carefully.  Mr. Arnone further

testified that he did all he could to try to make the lights work, and that he called issues to the attention of plaintiff and its electricians, but that problems at the facility were still not fixed.  Mr. Arnone also testified that lights returned from plaintiff worked properly at defendant's facility.

Electricians Roger Chaffin and Joel Troyer (who was hired by Mr. Arnone to conduct tests at the facility) testified that they did not observe anything to explain the failure of the lights to work properly.  They did not address in their testimony the specific problems noted by Mr. Arnone.

On March 6, 2012, Mr. Brooks wrote to Mr. Redinger in an e-mail that the lights were working fine.  On March 9, 2012, in another e-mail, Mr. Brooks wrote to Mr. Arnone and Mr. Redinger as follows:

> There is just something about the lights being turned off for longer periods of time, that's causing problems with them coming back on.  Throughout the week when there is little if any downtime for the lights to be off they work fine.  Then as soon as the weekend hits and they are turned off for longer periods, they always give us problems.

As Mr. Arnone conceded in his testimony, many of the tube lights shone with a yellowish tinge.  Mr. Brooks testified that, of the 675 lights still in use at plaintiff's facility (of the 991 originally purchased under the contract), 634 were not the correct color.  Mr. Arnone testified that the yellowish hue resulted from the way in which the lights sat in their fixtures, and he unsuccessfully attempted to address the issue.

Plaintiff introduced into evidence its monthly electric utility billing statements for the facility for dates ending in months from April 2010 through November 2014.  Those

statements revealed the consumption of electricity, measured in kilowatt hours, for each month for the entire facility, but they did not contain any evidence of the amount of consumption only from the facility's lights (as opposed to from other sources, such as the facility's heating/ventilation/air-conditioning (HVAC) system or exercise equipment). As shown by the statements, the average kilowatt hours consumed per day for the billing months ending from December 2010 through November 2012 were as follows:

| 2010 | December | 2325.0 | 2011 | December | 1710.0 |
|------|----------|--------|------|----------|--------|
| 2011 | January | 2149.4 | 2012 | January | 1438.1 |
| | February | 2294.0 | | February | 1518.8 |
| | March | 2420.0 | | March | 1819.3 |
| | April | 2629.7 | | April | 2042.0 |
| | May | 2830.3 | | May | 2166.4 |
| | June | 3184.0 | | June | 2403.8 |
| | July | 3534.4 | | July | 3036.0 |
| | August | 3792.4 | | August | 3297.9 |
| | September | 3400.0 | | September | 2623.6 |
| | October | 2860.6 | | October | 2145.5 |
| | November | 2416.6 | | November | 2033.8 |

These figures reveal that the overall consumption of electricity at the facility dropped significantly, in comparison to the same months for the prior year, after installation of defendant's lights at the facility in late 2011.

Defendant paid one bill from Roger Chaffin's company in the amount of $1,345.00 for work with the lighting at the facility after the original installation. Mr. Brooks testified that defendant agreed to pay this bill from Mr. Chaffin, and that Mr.

8

Arnone never indicated to him that defendant would not pay it or that plaintiff was responsible for that cost.  Mr. Brooks sent the bill to Mr. Arnone and Mr. Redinger in an e-mail dated March 21, 2012, in which Mr. Brooks wrote, "Please handle, thanks." In a return e-mail, sent less than one hour later, Mr. Arnone wrote, "I will send them the check."  The Court finds that plaintiff and defendant did not enter into any contract in which plaintiff agreed to reimburse defendant for this payment or otherwise assumed responsibility for that cost.

Defendant introduced into evidence a copy of an invoice, in the amount of $8,156.20, that Mr. Arnone testified was sent to plaintiff.  The invoice included credits for three kinds of lights returned from plaintiff.  In drafting the invoice, Mr. Arnone calculated those credits by taking the contract price for those lights and deducting 20 percent to account for Mr. Redinger's share of the contract proceeds.  The invoice also included charges, calculated from defendant's usual "book" price, for additional lights provided to plaintiff, most of which were intended as replacements for lights originally provided under the contract that plaintiff returned or was intending to return to defendant.  The Court finds that plaintiff and defendant did not enter into any contract that required plaintiff to pay defendant additional amounts, beyond the original contract price, for different or additional lights provided by defendant.[1]

---

[1]Additional factual determinations have been incorporated into the Court's Conclusions of Law.

## II.    Conclusions of Law

After resolution of pretrial motions, plaintiff's remaining claims, as preserved in the pretrial order, consist of claims for breach of warranty under Kansas's enactment of the Uniform Commercial Code (UCC), K.S.A. §§ 84-2-313, 84-2-314.[2]  Specifically, plaintiff alleges that defendant breached warranties relating to (1) energy savings to be realized by plaintiff in using defendant's lights; (2) the proper operation of the lights and thus their fitness for their ordinary purposes; and (3) the color of certain lights.  Plaintiff alleges consequential damages to compensate for (1) the energy savings that plaintiff allegedly failed to realize and (2) time spent by two employees in addressing problems with the lights.[3]

Under theories of breach of contract and quantum meruit, defendant alleges counterclaims against plaintiff to recover (1) $1,345.00, to repay the amount that defendant paid to an electrician, and (2) $8,156.20, to pay for additional products provided to plaintiff.

---

[2]The parties have applied Kansas law in this action, as has the Court.  *See Genesis Health Clubs, Inc. v. LED Solar & Light Co.*, 2014 WL 1246768, at *1 n.1 (D. Kan. Mar. 26, 2014) (ruling on defendant's motion for summary judgment).

[3]In the pretrial order, plaintiff also alleged that its "business has been damaged in the location where the defective lighting was installed."  Plaintiff concedes in its written closing argument, however, that "a specific dollar amount cannot be attributed to" any claim for damage to plaintiff's reputation.  Plaintiff did not submit any evidence at trial that it lost business because of issues with defendant's lights or that its reputation actually suffered with any customers.  Accordingly, to the extent that plaintiff has attempted to pursue such a claim for damages at trial, the Court concludes that defendant is entitled to judgment on that claim.

A.  *Claim for Breach of Warranty – Energy Savings*

1.  EXPRESS CONTRACTUAL WARRANTY

Plaintiff alleges that defendant breached express warranties relating to energy savings provided by the new lights.[4]  The Court first addresses the express warranty included in the parties' contract, which provided as follows:  "Based on the type of lighting replacement this project calls for LED Solar and Light Company warranties watt for watt exchange a minimum of 35% deduction in wattage consumption."

Defendant appears to argue that this warranty may be deemed satisfied merely based on a comparison of the stated wattage of the new bulbs to the stated wattage of the replaced bulbs.  Thus, according to defendant, it satisfied the warranty by providing 18-

---

[4]In the pretrial order, plaintiff also asserted a claim for breach of the implied warranty of merchantability based on the allegation that "[t]he lighting did not produce the wattage savings guaranteed by [defendant]."  The Court denied defendant's motion for summary judgment on that claim when it failed to respond to plaintiff's citation to K.S.A. § 84-2-314(2)(a), which requires merchantable goods to "pass without objection in the trade under the contract description."  *See Genesis*, 2014 WL 1246768, at *2.  The Court concludes, however, that reliance on that statutory provision is not appropriate in this case.  The "contract description" here consists of an express warranty of a 35-percent deduction in wattage consumption; thus, this complaint by plaintiff does not relate to some quality of the goods that may be evaluated by reference to the standard in the trade (but instead is measured against the contractual figure of 35 percent).  *See* K.S.A. § 84-2-314 cmt. 2 (merchantable goods must be of a quality comparable to that acceptable in the trade); *id.* cmt. 7 (paragraph (2)(a) relates to the standards of quality in the trade).  Thus, the Court concludes that judgment is appropriate in favor of defendant on any implied warranty claim relating to energy savings.  Moreover, even if an implied warranty of merchantability could be based on the contract description of a 35-percent-deduction guarantee, such claim would be duplicative of plaintiff's express warranty claim based on the contract provision, and thus such a claim would not need to be considered separately.

watt bulbs to replace 32-watt F48 bulbs (44 percent fewer watts), 40-watt bulbs to replace 96-watt F96 bulbs (58 percent fewer watts), and so on. Under that interpretation, however, this express warranty—which was the subject of separate negotiations—would be redundant, as the contract already provided for the purchase of particular replacement bulbs of the specified wattage. The language of this warranty does not promise a 35-percent deduction in the stated wattage of the bulbs; rather, it unambiguously promises a 35-percent deduction in wattage "consumption". Thus, regardless of the wattage stated for the bulbs, defendant's express warranty was satisfied only if there was a 35-percent reduction in the actually energy (wattage) *consumed* by the replacement lights.

The Court concludes, however, that plaintiff has not met its burden to show that defendant breached this warranty of a 35-percent deduction in the energy consumed by the lights. As evidence to support this claim, plaintiff offered only its electric bills for the facility and its own calculations of damages from those bills. Plaintiff has focused on the amounts of those bills, which have not necessarily decreased since the time prior to the replacement of the lights in the facility. Plaintiff has not made any attempt, however, to analyze the actual energy consumption shown by those billing statements. Nor has plaintiff attempted to determine the actual energy consumption for the lights alone at the facility (distinguished from other sources of energy consumption at the facility, such as the heating/ventilation/air-conditioning (HVAC) system and the exercise equipment). Thus, plaintiff has not shown that it did not realize a 35-percent deduction in wattage consumption from the lights after the replacement.

In fact, the evidence admitted at trial indicates that the 35-percent figure was likely satisfied at the facility.  The stated wattage amounts for the replacement bulbs, compared with that for the replaced bulbs, may not be dispositive of this claim, as noted above; but that wattage difference does provide strong evidence that a similar decrease in energy consumption from the lights did occur, especially in the absence of any evidence to the contrary.

Moreover, plaintiff's billing statements do show that plaintiff's overall wattage consumption at the facility did decrease significantly after the replacement of the lights. For example, in each of the 12 billing months ending on dates from December 2011 through November 2012, the average kilowatt hours (kwh) used per day at plaintiff's facility was significantly lower than the average usage from one year earlier.  The percentage reduction during that period ranged from a low of approximately 13.0 percent to a high of approximately 33.8 percent, with an average percentage reduction for the 12 month-long periods of approximately 24 percent.  In the absence of any evidence of a substantial reduction in energy usage from another source at the facility at that same time, it is reasonable to infer that the replacement of the lights did cause a substantial reduction in energy consumption from the lighting at the facility.  Plaintiff did not offer any evidence concerning the fraction of total energy consumption at the facility that was attributable to the lighting; but even if that fraction was as high as one-half prior to the replacement of the lights, the percentage deduction from the lights alone would have

been double the percentage figures for the facility as a whole.[5]   The only evidence relating to the size of that fraction was Mr. Arnone's estimate that the lighting "pull"—the consumption from lighting alone—was approximately one-third of the total consumption for the facility for a given month prior to the replacement of the lights.  If that estimate is close at all—and Mr. Arnone was a very credible and persuasive witness—then the actual deduction in wattage consumption from the lighting at plaintiff's facility far exceeded the 35-percent contractual figure.

For these reasons, the Court concludes that plaintiff did not meet its burden to prove a breach of the express warranty contained in the contract relating to energy savings, and defendant is therefore granted judgment on that claim.

## 2.   EXTRA-CONTRACTUAL WARRANTY

Plaintiff also alleges that defendant breached express warranties made by Mr. Redinger, as an alleged agent of defendant, prior to the execution of the parties' contract.[6]   The particular warranty alleged by plaintiff is not entirely clear, however.

First, plaintiff appears to allege that Mr. Redinger made an express warranty, in

---

[5]For instance, the facility's total electricity usage for the billing month ending in January 2012 averaged 1438.1 kwh/day, a 33.1 percent reduction from the average of 2149.4 kwh/day from the billing month ending in January 2011.  If lighting represented one-half of the January 2011 consumption for the facility, and all other consumption remained constant, then consumption from the lighting alone would have been reduced approximately 66.2 percent (from 1074.7 kwh/day to 363.4 kwh/day) for January 2012 compared to the previous year.

[6]Plaintiff did not assert a claim in this action for fraudulent inducement of the contract with defendant.

his e-mail to Mr. Brooks of August 23, 2011, that plaintiff's total electric bills would decrease in the amount of $3,928.80 per month after installation of defendant's lights. Second, and seemingly in the alternative, plaintiff appears to argue that Mr. Redinger, in his e-mail, even if he did not warranty savings of a particular dollar amount, did provide an express warranty that plaintiff's wattage from its lighting would decrease in the amount of 49,110 watts.  In one chart offered into evidence, plaintiff calculated its damages by multiplying 49,110 by an estimated rate from each billing statement (which rate increased over time)—just as Mr. Redinger multiplied 49,110 times an estimated rate of eight cents to arrive at the $3,928.80 figure in the e-mail—to yield a promised savings amount for each month (which was then compared to a figure that purported to show the actual savings or loss for that month compared to a 2010 baseline for that month).[7]  Third, plaintiff alleges that defendant, through Mr. Redinger, made an express

---

[7]Plaintiff's method of calculation is not sound.  Mr. Redinger (in his e-mail) and Mr. Brooks (in his damages chart) took an estimated kilowatt-hour rate (which began at eight cents based on 2011 billing statements), which was computed by dividing the total bill for a month by the number of kilowatt hours used in that month; then, they did *not* apply that rate to some number of kilowatt hours, but they instead multiplied the rate by 49,110 *watts* (a number derived by adding up the differences in stated wattage between the old bulbs and the replacement bulbs that would be purchased from defendant).  In order to apply the kilowatt-hour rate properly, Messrs. Redinger and Brooks needed to convert that reduced wattage amount of 49,100 to kilowatts by dividing by 1000, and then multiply that figure by some number of hours that the lights would be used in a month, to yield some number of kilowatt hours.  This obvious and fundamental flaw in Mr. Redinger's method of calculation undermines the notion that any such affirmation could be an express warranty that could truly have become part of the basis of the bargain between the parties, and it provides yet another basis, beyond the disclamatory language in the e-mail itself, for the Court's conclusion that Mr. Redinger did not make
(continued...)

warranty that plaintiff would realize savings on its total energy bill sufficient to cover its monthly payment on the loan it ultimately received to pay for the new lights (that payment proved to be $1,685.34 per month).  Mr. Redinger made no reference to covering plaintiff's loan payment in his e-mail; Mr. Brooks testified, however, that Mr. Redinger made such a promise in presenting the deal to him.

K.S.A. § 84-2-313, which governs express warranties involving the sale of goods, provides in relevant part as follows:

> (1) Express warranties by the seller are created as follows:
>
> (a)     Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> . . .
>
> (2)     It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

*See id.*  The official UCC comment to that section provides in relevant part as follows:

> 8.     Concerning affirmations of value or a seller's opinion or commendation under subsection (2), the basic question remains the same: What statements of the seller have in the circumstances and in objective judgment become part of the basis of the bargain?  As indicated above, all of the statements of the seller do so unless good reason is shown to the contrary.  The provisions of subsection (2) are included, however, since

---

[7](...continued)
any extra-contractual express warranty.

16

common experience discloses that some statements or predictions cannot fairly be viewed as entering into the bargain.   . . .

*See id.* cmt. 8.  The Kansas comment to this section further provides as follows:

> 3.        Subsection (2) states that mere affirmations of value of the goods, opinions, commendations, or forms of "puffing" do not create express warranties.  A statement by the seller is less likely to create an express warranty if it is verbal rather than written; general rather than specific; related to the consequences of buying rather than the goods being bought; "hedged"; phrased as a statement of opinion rather than fact; or not capable of objective measurement.   . . .

*See id.* Kan. cmt. 3.  K.S.A. § 84-2-316, which addresses the exclusion or modification of warranties, provides in relevant part as follows:

> (1)      Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other . . . .

*See* K.S.A. § 84-2-316(1).  The Kansas comment to this section states that although an irreconcilable conflict between language creating a warranty and language disclaiming a warranty is generally resolved in favor of the warranty, "the fact of the purported disclaimer may be relevant to whether an express warranty was made at all or the scope of the express warranty." *See id.* Kan. cmt. 1.  Whether an affirmation creates an express warranty presents a question of fact.  *See Young & Cooper, Inc. v. Vestring*, 214 Kan. 311, 311 syl. ¶ 2 (1974).

Defendant argues that any warranties made prior to execution of the contract were disclaimed by the statement in the contract that "[a]ny other verbal or written proposals or agreements preceding this proposal are void."  The Court rejects this argument.  The

17

statement did not mention prior warranties and referred only to "proposals or agreements."  It immediately followed the statement that "[t]his proposal" is valid for 30 days, and the proposal above the parties' signatures involved only the number, wattage, and cost of the lights.  Thus, the statement is most reasonably read to disclaim only proposals or agreements concerning those terms.  As explained above, under section 84-2-316, any such disclaimer language must be interpreted if possible in a manner consistent with any warranty language, and the Court's interpretation of this statement as unrelated to prior express warranties achieves that desired consistency.  Moreover, even if the contract were ambiguous on this issue, it would be interpreted against defendant as the drafter of the contract.  *See Liggatt v. Employers Mutual Cas. Co.*, 273 Kan. 915, 921 (2002).  As noted by the Court in its prior order, the cases cited by defendant on this issue involved more explicit disclaimers of warranties and are therefore distinguishable from the present case.  *See Genesis*, 2014 WL 1246768, at *5 (citing cases).  Accordingly, the Court concludes that plaintiff's extra-contractual warranty claims are not precluded by the contract's disclaimer language.

Nevertheless, the Court concludes that Mr. Redinger did not make any express warranty concerning energy savings beyond the 35-percent-deduction warranty expressly stated in the contract.[8]  Plaintiff relies most heavily on Mr. Redinger's e-mail to Mr.

---

[8]In light of this conclusion and the Court's other conclusions that plaintiff is not entitled to recover on its claims, the Court need not determine whether statements by Mr. Redinger may be attributed to defendant through agency.

Brooks on August 23, 2011 (quoted above).  The Court concludes that Mr. Redinger did not make any promise or affirmation of fact in that e-mail, which promise became the basis of the parties' bargain, to the effect that plaintiff would realize energy savings from the new lights in any particular dollar amount.  Mr. Redinger made very clear by his language that he was not making any promise or guarantee beyond the express warranty contained in the proposed (and eventual) contract.  Mr. Redinger was responding to an inquiry suggesting a belief by Mr. Brooks that the 35-percent warranty meant that plaintiff's total electric bill would decrease at least by 35 percent.  Mr. Redinger began his answer to that inquiry by quoting and highlighting the contract's provision.  Mr. Redinger then suggested his interpretation of the 35-percent warranty (which proved inaccurate, as set forth above) by linking the 35-percent figure to a comparison of the wattage of the bulbs.  He then performed a calculation to arrive at a specific dollar amount, but he hedged by stating that that figure "seem[ed]" to be safe for engaging replacement.  He immediately followed that opinion by stating expressly that he could *not* guarantee that figure, and he cited two reasons (rate changes, bulbs not at full capacity wattage) why no such guarantee could be made.  He again linked the wattage reduction to the wattage on the lights themselves, and he noted that, as he and Mr. Brooks had previously discussed, the contractual warranty related to the light replacement only (punctuated by an exclamation point for emphasis).  He then directly corrected Mr. Brooks's assumption about the warranty by stating that he could not "guarantee a 35% reduction in [plaintiff's] total utility bill in its entirety."  He then noted

19

that he did not know the energy consumption of plaintiff's HVAC system, although he opined that replacement of plaintiff's lights with LED lights would diminish plaintiff's energy usage dramatically. Thus, when considered in its entirety, Mr. Redinger's e-mail clearly does not create any additional express warranty, and instead takes pains to impart that no particular amount of savings would be guaranteed or promised.

This conclusion is supported by application of the particular standards contained in Sections 84-2-313 and 84-2-316 of the UCC. In his e-mail, Mr. Redinger indicated that he was *not* making any promises or affirmations of fact beyond the contract language. Mr. Redinger merely gave his opinion that significant savings would be realized, and the language of the e-mail provides "good reason" to find that the basis of the bargain did not include any extra-contractual warranty by Mr. Redinger. In the language of the statute's comment, a finding that the e-mail created no additional warranty is supported by the fact that Mr. Redinger's references to savings related to a consequence of plaintiff's purchase (and not to the goods themselves) and by Mr. Redinger's hedging to the point that he twice disclaimed making any guarantees relating to dollar amounts. Moreover, under Section 84-2-316, Mr. Redinger's disclaimers must be read if possible in a manner consistent with any express warranties, and that consistency is best achieved by finding that Mr. Redinger did not make any warranty beyond that stated in the contract. As stated in the comment to that statute, such language of disclaimer may inform whether an express warranty was made, and in this case, Mr. Redinger's insistence that he was making no promises as to dollar savings

20

indicates that he did not make any such warranty as alleged by plaintiff.  The Court also finds it significant that Mr. Redinger did *not* testify at trial that he intended to or did make any promises or guarantees beyond the warranty contained in the contract (tellingly, he was not asked that question).

Plaintiff also alleges that Mr. Redinger made a warranty that it would achieve energy savings in an amount sufficient to cover its monthly loan payment.  Mr. Redinger's e-mail of August 23, 2011, did not make any specific reference to covering plaintiff's loan payment.  Mr. Redinger did state in that e-mail that it "seem[ed]" safe to to engage replacement based on his calculation, but for the same reasons set forth above, the Court concludes that Mr. Redinger did not make any express warranty of a particular amount of dollar savings by language in his e-mail.

Plaintiff has not alleged that Mr. Redinger made express warranties in any other writing.  Apparently, plaintiff also relies on oral statements by Mr. Redinger, as Mr. Brooks testified that Mr. Redinger presented the deal with defendant as one that would involve sufficient energy savings to cover plaintiff's loan payment.  Mr. Brooks did not indicate when Mr. Redinger made any such representation.  Mr. Brooks did testify, however, that Mr. Redinger's August 23, 2011, e-mail caused plaintiff to decide to execute the written agreement with defendant, which Mr. Brooks signed the following day.  Thus, the Court finds that any such representations were made prior to Mr. Redinger's e-mail.  The e-mail made clear to Mr. Brooks that the agreement with defendant would include no such warranty of energy savings of a particular amount, for

the reasons already discussed.  Thus, any such oral representation by Mr. Redinger, even if made as an affirmation of fact, could not have been part of the basis of the bargain. Moreover, Mr. Brooks did not quote Mr. Redinger's actual oral representations, and Mr. Redinger's e-mail makes it unlikely that he would have made an express warranty of a particular dollar amount of savings.  Again, Mr. Redinger did *not* testify that he made any additional warranties.  In fact, when asked whether he knew the amount of plaintiff's loan for the lights, Mr. Redinger could not say whether in fact he had been told that figure.  For these reasons, the Court concludes that Mr. Redinger did not make any express warranty to the effect that plaintiff would achieve energy savings in an amount sufficient to cover its loan to pay for the lights.[9]

Plaintiff also appears to argue that, even if Mr. Redinger did not make any warranty of energy savings in a particular dollar amount in his e-mail to Mr. Brooks, he did at least make an express warranty of a 49,110-watt reduction in plaintiff's total electricity usage for the facility, which savings could be calculated from the same (flawed) formula used by Mr. Redinger in his e-mail.  The Court rejects this claim as well.  The Court finds that Mr. Redinger made no such warranty in his e-mail.  For the same reasons set forth above, it is clear that Mr. Redinger made no promises concerning

---

[9]Plaintiff's claim, to the extent based on a warranty of a particular dollar amount of savings from the lights alone, also fails because plaintiff failed to prove a breach of that warranty or damages.  To meet those elements, plaintiff relied solely on its electric bills and its charts by which it attempted to calculate damages.  As noted above, however, plaintiff failed to provide any evidentiary basis to break down plaintiff's electric bills by consumption from the lighting and consumption from other sources.

energy savings beyond that contained in the contract itself.  He used the 49,110-watt figure in calculating possible savings for plaintiff, while insisting that he could not guarantee any such savings amount.  One of the reasons given by Mr. Redinger for his inability to guarantee savings for the facility as a whole—the fact that not every bulb was at full capacity—would also prevent him from being able to guarantee a particular reduction in consumption for lighting for the entire facility.

Moreover, even if Mr. Redinger did make some sort of express warranty of a savings of 49,110 watts, plaintiff has not proved either that defendant breached such a warranty or that plaintiff suffered damages from such a breach.  Mr. Redinger did not state that the facility would see any particular reduction in its consumption or its kilowatt-hours used.  Plaintiff has not argued that the wattage of the bulbs to be purchased under the contract, as computed by Mr. Redinger, are not in fact 49,110 watts less that the existing bulbs.  If plaintiff is claiming a warranty of a reduction of some amount of consumption from the lights, plaintiff failed in its proof of a breach, as plaintiff's electric bills and damage charts do not break out the consumption for lights alone and do not account for the possibility of increases in consumption from other sources.

For these reasons, the Court concludes that plaintiff has failed to satisfy its burden to prove that defendant breached any warranty relating to energy savings.

### B.     *Claim for Breach of Warranty – Defects*

Plaintiff also claims that the new lights did not operate properly and thus were defective, and that defendant therefore breached the implied warranty of merchantability under K.S.A. § 84-2-314.[10]   Plaintiff alleges that various lights on various occasions would work only partially or not at all, or would flicker, or would delay in turning on. Under Section 84-2-314, to be merchantable, goods must be fit for their ordinary purpose and must run of even kind and quality.  *See id.*

The Court concludes that plaintiff has not met its burden to prove, by a preponderance of the evidence, that any particular lights were in fact defective.  There is no question that plaintiff had issues with the new lights at its facility, as each witness who saw the lights testified that he observed lights not working properly.  Plaintiff did not show, however, that more likely than not the problem lay with the lights themselves.

Mr. Arnone, a licensed electrician, gave very credible and persuasive testimony about a number of problems that he observed at plaintiff's facility that contributed to the failure of the lights to operate properly.  For example, Mr. Arnone testified to the following problems: when certain lights were installed, the electricians did not use cables to tie certain heavy lights in place, which failure could have caused damage and caused the lights to lose contact with the sockets; electricians caused damage by forcing some lights in place from above instead of properly installing them from below; existing wall switches had been improperly installed, which caused lights not to come back on after

---

[10]Plaintiff did not assert any claim for breach of the two-year express warranty contained in the contract.

being off for a period of time; other circuits were turned off; a completed circuit could not be made in various fixtures; existing sockets (which in some cases were not the original sockets for the facility) were defective; electricians did not avoid banging the lights against surfaces, which lack of care could have damaged the lights' electronic parts (Mr. Arnone did observe damaged parts); and lights were not stored carefully. Mr. Arnone further testified credibly that he did all he could to try to make the lights work, and that he called issues to the attention of plaintiff and its electricians, but that problems at the facility were still not fixed. Mr. Arnone's testimony about specific problems at the facility easily overcomes the testimony by electricians Roger Chaffin and Joel Troyer that they did not observe anything to explain the failure of the lights to work properly. Significantly, these two electricians did not address in their testimony the specific problems noted by Mr. Arnone, and plaintiff thus offered no expert or other evidence to discount or rebut Mr. Arnone's credible testimony.

Other evidence supports the Court's conclusion. Mr. Arnone testified that all of the lights sold to plaintiff were tested and operated properly for 24 hours at defendant's facility prior to shipping, and that lights returned from plaintiff again worked fine at defendant's facility. Mr. Brooks testified that all of defendant's lights worked properly when first installed at plaintiff's facility, with problems then developing over time. On March 6, 2012, Mr. Brooks stated to Mr. Redinger in an e-mail that the lights were working fine. Three days later, in another e-mail, Mr. Brooks stated to Mr. Arnone and Mr. Redinger that the lights worked fine except that they would not come back on after

weekends, as follows:

> There is just something about the lights being turned off for longer periods of time, that's causing problems with them coming back on.  Throughout the week when there is little if any downtime for the lights to be off they work fine.  Then as soon as the weekend hits and they are turned off for longer periods, they always give us problems.

These e-mails—and the fact that plaintiff continues to use the great majority of the lights to this day—suggest that plaintiff has overstated the magnitude of its problems with the lights.  Moreover, Mr. Arnone specifically addressed this problem with the lights failing to come on after weekends in his testimony.  Mr. Arnone explained that if circuits were not completed properly (for instance, if arcing occurred), the lights by their design would still light sometimes, but after nine such attempts, the lights would simply shut off and need to be reset—and then not come back on at all if the process were repeated a number of times; thus, after longer periods like weekends (during which the lights exhausted their attempts to make the circuit), the circuit breakers might need to be tripped.  Again, plaintiff offered no evidence to rebut that explanation from Mr. Arnone.  Finally, Mr. Arnone was able to support his testimony by pointing to damage on sample lights brought to trial by plaintiff from its facility.  In one case, a sample light came on in the courtroom when plugged in, much to the surprise of Mr. Brooks and plaintiff's counsel. The Court did not find significant the fact that some samples did not light in the courtroom, in view of the fact that those lights were first installed years ago and in view of Mr. Arnone's testimony that such lights were designed not to operate after repeatedly failing to find a completed circuit.

For these reasons, and based on this evidence, the Court concludes that plaintiff did not meet its burden to show that the lights failed to operate because the lights themselves were defective (and not because of issues in installation and at plaintiff's own facility).   Accordingly, the Court awards judgment in defendant's favor on this claim for breach of warranty.

C.    *Claim for Breach of Warranty – Color*

For its third claim, plaintiff accuses defendant of a breach of warranty because the lights—in particular, the 991 4-foot tube lights purchased under the contract—were not uniformly white in color.   Plaintiff alleges a breach of the implied warranty of merchantability pursuant to K.S.A. § 84-2-314, which requires that goods run of even kind and quality.   *See id.* § 84-2-314(2)(d).   Plaintiff also asserts a claim for breach of an express warranty that the lights would be uniformly white.   Defendant argues that Mr. Redinger was not acting as its agent when he made any such express warranty.   Mr. Arnone testified, however, that plaintiff wanted and defendant agreed to provide white bulbs. Moreover, under K.S.A. § 84-2-313(1)(c), any sample or model that is made part of the basis of the bargain creates an express warranty, and Mr. Brooks and Mr. Redinger testified that plaintiff entered into the agreement on the assumption that the lights would match the samples provided by defendant, which were white.   Accordingly, the Court finds that defendant did make an express warranty that the bulbs would be uniformly white.

It is undisputed that many of the tube lights shone with a yellowish tinge.  Mr. Brooks testified that, of the 675 lights still in use at plaintiff's facility, 634 were not the correct color.  Mr. Arnone testified that the yellowish hue resulted from the way in which the lights sat in their fixtures, and he unsuccessfully attempted to address the issue.  Defendant conceded in its closing argument that the tube lights had a yellowish hue.

Nevertheless, plaintiff's claim fails because it has failed to meet its burden to show that it suffered any damages from a breach of warranty relating to the color of the lights.  *See, e.g.*, *Limestone Farms, Inc. v. Deere & Co.*, 29 Kan. App. 2d 609, 613 (2001) ("Proof of damages is an essential element in an action for breach of express warranty.") (citing PIK Civil–3d 128.12); *see also* PIK Civil–4th 128.11, 128.12 (pattern instructions make a party who breaches an implied or express warranty liable to "injured" persons).  Plaintiff asserts a claim for consequential damages based on the time spent by two employees in dealing with problems with the lights.  Specifically, Mr. Brooks testified that he (at an annual salary of $85,000) spent 60 hours over a three-month period "on this project," including trying to get the lights to work, and that plaintiff's maintenance director (at an annual salary of $44,000) spent at least that same amount of time "on this project."  Plaintiff did not submit any evidence, however, of the amount of time, if any, that any employee was required to perform extra work specifically as a result of any breach of warranty relating to the color of the lights (as

opposed to work performed because the lights did not operate properly).[11]  Thus, there is no basis for the Court to determine any amount of damages suffered by plaintiff on this claim for breach of warranty, and the Court therefore awards judgment to defendant on this claim.

### D.   *Counterclaims*

Defendant asserts counterclaims, under alternative theories of breach of contract and quantum meruit, for two separate damage amounts.  As preserved in the pretrial order, defendant claims "payment of [plaintiff's] electrician's bill of $1,345 based on [plaintiff's] claim that it could not get the LED lights to work, when the actual problem was that [plaintiff's] existing fixture sockets were defective or [plaintiff] had mishandled and broke [*sic*] certain products;" and defendant claims damages for "the shipment of additional products to [plaintiff] which [plaintiff] ordered from [defendant], valued after all credits for returns, at $8,156.20."

### 1.   ELECTRICIAN'S BILL

Defendant paid a bill from plaintiff's electrician, Roger Chaffin (Chaffin Electric), in the amount of $1,345.00, and it seeks to recover that amount from plaintiff by counterclaim.  Defendant appears to have abandoned this claim—it did not offer any evidence to support this claim at trial, and it failed to address this claim either in its

---

[11]In its closing argument, plaintiff referred only labor costs for the two employees to deal with problems associated with "the defective lights" and "the faulty lights."

proposed findings and conclusions or in its written closing argument. Nevertheless, because the claim was preserved in the pretrial order, the Court will address it.

The Court first rejects defendant's claim for such damages for breach of contract. At trial, Mr. Arnone did not testify about this claim or defendant's payment of this bill. Thus, defendant offered no evidence that the parties entered into any agreement that plaintiff would be responsible for this payment.[12]  In fact, the only evidence was to the contrary.  Mr. Brooks testified that defendant agreed to pay this bill from Mr. Chaffin, and that Mr. Arnone never indicated to him that defendant would not pay it or that plaintiff was responsible for that cost.  Plaintiff introduced into evidence one e-mail by which Mr. Brooks forwarded the bill to Mr. Arnone and Mr. Redinger, with the request, "Please handle, thanks."  Plaintiff also offered into evidence a return e-mail in which Mr. Arnone stated, "I will send them the check."  Based on that evidence, the Court finds that the parties did not enter into any contract in which plaintiff agreed to reimburse defendant or otherwise assumed responsibility for that cost.

The Court also rejects defendant's claim for such damages under a theory of quantum meruit.  Quantum meruit, also called unjust enrichment, is an equitable doctrine sounding in quasi-contract.  *See Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*,

---

[12]Defendant has not argued that such an obligation arose under the parties' original contract.  That contract did not provide for installation of the lights, which therefore became plaintiff's responsibility; but Mr. Chaffin's testimony that this bill was for work performed after the initial installation was not rebutted.  Thus, defendant was required to prove the existence of an additional contract in order to prevail on this counterclaim.

259 Kan. 166, 176 (1996). "The basic elements of a claim based on a theory of unjust enrichment are threefold: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *See id.* at 177 (quoting *J.W. Thompson Co. v. Welles Prods. Corp.*, 243 Kan. 503, 512 (1988)).

First, defendant has not shown that it conferred a benefit on plaintiff, for a number of reasons—plaintiff was not necessarily obligated to pay this bill, in light of defendant's agreement to pay it, so defendant was not paying this bill *for* plaintiff; because, according to Mr. Arnone, Mr. Chaffin only exacerbated the problems at plaintiff's facility, hiring him to do work there arguably did not prove any benefit to anyone; and any benefit also accrued to defendant, as Mr. Arnone also wanted to take steps to figure out any problems with the lights. Moreover, in light of the evidence of defendant's explicit agreement to pay this bill, the Court cannot say that it would be inequitable if plaintiff did not repay defendant for this cost. Accordingly, the Court rejects plaintiff's claim for such damages under a theory of quantum meruit. The Court awards judgment in plaintiff's favor on this counterclaim.

## 2.   ADDITIONAL PRODUCTS

Defendant also seeks to recover $8,156.20 for additional products provided to plaintiff that were not included in the parties' original contract. In an invoice allegedly sent to plaintiff (Mr. Brooks denied that plaintiff ever received such an invoice),

defendant calculated that amount by charging its book price for certain additional lights supplied to plaintiff, and then applying as a setoff various credits for lights returned to defendant by plaintiff (plus an additional amount for shipping and handling).

As an initial matter, the Court notes that defendant improperly calculated the amount of the setoff for returned products.  In calculating those credits, defendant allowed only 80 percent of the price that plaintiff had paid in the original contract for each returned light.  Mr. Arnone testified that he made that deduction to account for the fact that, in paying the original contract price of $82,271.50, plaintiff actually paid 80 percent of that amount directly to defendant, with the other 20 percent going directly to Mr. Redinger.  Under the unambiguous terms of the contract between the parties, however, defendant sold the lights for the total price of $82,271.50.  The evidence showed that defendant had a separate agreement with Mr. Redinger that he would receive 20 percent of the sale price on a sale to plaintiff, and that plaintiff paid that 20-percent share directly to Mr. Redinger at defendant's request, but those facts do not change the price at which defendant sold the products to plaintiff.  Thus, defendant may or may not have had recourse against Mr. Redinger for his share of credits issued to plaintiff, but by agreeing to a refund for returned products, defendant agreed to refund the actual contract price.  Thus, the amount of the setoff is too low by that 20 percent.[13]

The Court next concludes that defendant did not meet its burden to show the

---

[13]Plaintiff did not assert in this action any affirmative claim against defendant for breach of an agreement to provide refunds.

existence of a contract obligating plaintiff to pay for the additional lights.  These lights were not included in the parties' original contract, and defendant has not argued that that contract created an obligation for plaintiff to pay for the additional lights provided by defendant.  Nor has defendant shown that the parties entered into a new agreement requiring payment by plaintiff.  Mr. Arnone and Mr. Brooks both testified that certain lights included in the original contract were exchanged for other lights from defendant.  Mr. Brooks testified that plaintiff did not agree to purchase any lights from defendant after the original contract and that he maintained the position during the exchange that plaintiff was not obligated to pay additional amounts.  Mr. Arnone testified that he did not agree to provide the replacement bulbs at no charge, but he did not offer any testimony about any discussions between the parties concerning payment for the replacement lights.  Mr. Arnone also stated, " A lot of times I'll give a client latitude on switching lamps in and out."  Neither party has cited any documentary evidence bearing on the existence or lack of any agreement regarding the additional lights.  Thus, Mr. Brooks's testimony that plaintiff did not agree to pay more for the replacement lights was essentially unrebutted.  Based on that evidence, the Court concludes that defendant did not prove, by a preponderance of the evidence, that plaintiff agreed to pay additional amount to account for additional lights from defendant, and the Court thus rejects defendant's claim for breach of contract.

The Court also rejects defendant's quantum meruit claim, as the Court remains unpersuaded that it would be unfair for plaintiff not to pay any additional amount.  To

his credit, Mr. Arnone went to some lengths to try to fix any problems with plaintiff's lights; for instance, he flew to Kansas to visit plaintiff's facility, he offered to pay for some new sockets, and he hired an additional electrician to conduct tests at the facility. Such conduct, however, could reasonably have suggested to plaintiff that defendant also did not expect payment for the additional lights. There is no evidence that Mr. Arnone ever told plaintiff that it would have to make additional payments. Moreover, the fact that Mr. Arnone did not send his invoice at the time the lights were being exchanged, but instead waited at least until September 21, 2012 (the date on the invoice)—by which time the parties' dispute and mutual frustration appears to have escalated—further undermines the credibility of any claim that defendant expected additional payments from plaintiff at the time of the exchanges. Thus, the Court concludes that equity does not demand that plaintiff pay any additional amounts, and the Court therefore finds against defendant on its quantum meruit claim. Accordingly, the Court awards judgment in favor of plaintiff on this counterclaim asserted by defendant.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant is awarded judgment on plaintiff's claims, and plaintiff shall take nothing by those claims.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiff is awarded judgment on defendant's counterclaims, and defendant shall take nothing by those claims.

IT IS SO ORDERED.


Dated this 23rd day of January, 2015, in Kansas City, Kansas.


<u>s/ John W. Lungstrum</u>
John W. Lungstrum
United States District Judge